**Holland ST. JOHN, M.D., Petitioner,**

v.

**Marty Howard POPE and Sally Bates Pope, Respondents.**

**No. D–4603.**

Supreme Court of Texas.

Argued Oct. 18, 1994.

Decided June 8, 1995.

Rehearing Overruled Aug. 1, 1995.

---

James B. Ewbank, II, Walter L. Taylor, A. Allain Provosty, Austin, for petitioner.

Richard Schechter, Houston, for respondents.

GONZALEZ, Justice, delivered the opinion of the Court, in which all Justices join.

The issues in this medical malpractice case are whether an on-call physician, consulted by an emergency room physician over the telephone, formed a physician-patient relationship by expressing his opinion that the patient be transferred to another facility, and if not, whether the physician owed duties outside that relationship. The trial court rendered a take-nothing summary judgment in favor of the physician. The court of appeals reversed and remanded the cause to the trial court. 862 S.W.2d 657. We reverse the judgment of the court of appeals and render a take-nothing judgment in favor of the physician.

The summary judgment facts reveal that Marty Howard Pope came to the emergency room of Central Texas Medical Center in San Marcos (the Center), complaining of back pain and fever. Pope had recently undergone back surgery and epidural injections, and his white blood cell count was extremely high. The emergency room physician, Dr. Virgilio Suarez, examined Pope and initially diagnosed the patient as having lower back pain and acute psychosis. Pope's wife asked to transfer her husband to Round Rock Hospital because the couple lived in Austin and the physician who had previously treated Pope practiced at the Round Rock Hospital.

Meanwhile, Suarez telephoned Dr. Holland St. John at home. St. John, a board-certified internist, was on call at the hospital on the evening in question. Suarez recounted to St. John that he had received a patient for evalu-

ation of fever and back pain who had a history of recent back surgery. Because St. John's area of specialization was not neurology or neurosurgery, and the Center was not able to handle cases involving these specialties, St. John recommended that Pope be referred to a hospital with the requisite neurosurgeon or to the physician who had performed the surgery. Suarez agreed, and indicated that he would arrange the transfer.

Suarez called Pope's doctor, but for reasons not clear in the record, the Round Rock Hospital's emergency room refused to accept the transfer. Not wishing to hospitalize her husband in San Marcos, Mrs. Pope took her husband home against the advice of the staff at the Center. The following day, an ambulance transported Pope to an Austin hospital. There a lumbar puncture revealed that he was suffering from meningitis. Pope developed several permanent disabilities from the disease.

The Popes sued the Center and the Round Rock Hospital, two Round Rock physicians, Suarez, and St. John. Their petition alleged generally that the defendants failed to exercise professional care and were negligent. The petition did not set out the particular circumstances giving rise to liability for any of the defendants.

The Popes' sole allegation concerning St. John's liability, stated in Plaintiffs' Second Amended Original Petition, was that:

> 6. On July 3, 1990, Defendants CENTRAL TEXAS MEDICAL CENTER, INC., CENTRAL TEXAS MEDICAL CENTER, ROUND ROCK INDEPENDENT ASSOCIATION, INC., and ROUND ROCK HOSPITAL, through their agents, servants, and/or employees, and STEVEN WILSON, M.D., VIRGILIO SUAREZ, M.D., and HOLLAND ST. JOHN, M.D. jointly and severally violated the duty owed to Plaintiffs to exercise the ordinary care and diligence exercised by physicians and/or health facilities in the same or similar circumstances and were each negligent in their treatment of MARTY HOWARD POPE.

St. John moved for summary judgment on the ground that no physician-patient relationship existed between him and the Popes, and

therefore he owed no duty of care. He supported his motion with his own affidavit and medical records from the Center.

The Popes opposed the motion with an affidavit from a board-certified internist, Dr. Robert Levine, and an affidavit which St. John had filed earlier in the case. In that affidavit, St. John testified that he met the standard of care of an on-call internist. The Popes contended that by testifying as to the standard of care of an on-call physician, St. John's prior affidavit was some evidence that he had a duty of care. They also contended that their consent to treatment by Suarez at the Center also implied consent to be treated by on-call physicians, therefore giving rise to a doctor-patient relationship with St. John. They alleged that St. John was negligent in assuming Pope suffered from a neurosurgical problem without personally examining the patient, and that other medical personnel relied on his negligently formed opinion.

Levine stated in his affidavit that any certified internist should have recognized the possibility of an "infectious process, given a history of fever following an invasive procedure." Levine further stated that in light of the information he received over the telephone, St. John should have seen Pope personally and performed a lumbar puncture, which would have permitted a correct diagnosis, and that such a procedure was "clearly within the domain" of an internist. According to expert medical testimony, the prognosis for meningitis depends on how fast it is diagnosed and treated.

The trial court granted St. John's motion expressly on the ground that he owed no duty because there was no physician-patient relationship. The trial court severed the Popes' cause of action against St. John from their case against the remaining defendants.

On appeal, the court of appeals held:

> ... Irrespective of any contract relationship between St. John and Pope, the law imposed upon St. John a duty to act with ordinary care toward Pope if the circumstances were such that a reasonably prudent person in St. John's position would recognize that his acts, unless done with ordinary care, would place Pope in danger.

. . . .

By *undertaking* affirmatively to identify Pope's ailment based on the information supplied by Suarez, St. John assumed a legal duty to act with ordinary care in arriving at his identification and his consequent determination of whether he was qualified to treat the ailment.

862 S.W.2d at 660–61.

■ In short, the court of appeals held that lack of a physician-patient relationship between Pope and St. John would not entitle the doctor to summary judgment. Rather, the court concluded that St. John's duties are defined under the rules of ordinary negligence—what a reasonably prudent person would do under the same or similar circumstances. 862 S.W.2d at 660. Other courts of appeals have held that a physician cannot be liable for malpractice unless the physician breaches a duty flowing from a physician-patient relationship. *See, e.g., Wheeler v. Yettie Kersting Memorial Hosp.,* 866 S.W.2d 32, 38 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Lopez v. Aziz,* 852 S.W.2d 303, 305 (Tex.App.—San Antonio 1993, no writ); *Wilson v. Winsett,* 828 S.W.2d 231, 233 (Tex. App.—Amarillo 1992, writ denied); *Fought v. Solce,* 821 S.W.2d 218, 220 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Salas v. Gamboa,* 760 S.W.2d 838, 840 (Tex.App.—San Antonio 1988, no writ); *Johnston v. Sibley,* 558 S.W.2d 135, 137 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.); *Childs v. Weis,* 440 S.W.2d 104, 106 (Tex.Civ.App.—Dallas 1969, no writ). We conclude that this line of cases correctly states the rule that malpractice is predicated on a physician-client relationship.

Medical malpractice developed as a theory of liability discrete from common-law negligence, imbued with both contract and tort principles. *See* 1 LOUISELL & WILLIAMS, MEDICAL MALPRACTICE § 8.01, at 8–2, 8–18 to 8–19 (1990) (noting that medical malpractice developed under the theory of "public calling" prior to the time negligence emerged as a separate tort). The standard of care demanded in medical malpractice cases requires skills not ordinarily possessed by lay persons. *Id.* at 8–3; *see Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977) (holding medical malpractice typically requires expert testimony to establish the medical standard of care). Medical malpractice also differs from ordinary negligence in the circumstances under which a duty arises. Generally the duty to refrain from negligently injuring others requires no prior relationship. For example, a motorist owes to complete strangers the duty to stop at traffic signals. By contrast, professionals do not owe a duty to exercise their particular talents, knowledge, and skill on behalf of every person they encounter in the course of the day. As is true of all callings, physicians are not obligated to practice their profession or render services to everyone who asks. It is only with a physician's consent, whether express or implied, that the doctor-patient relationship comes into being. Thus we agree with those cases that hold that the duty to treat the patient with proper professional skill flows from the consensual relationship between the patient and physician, and only when that relationship exists can there be a breach of a duty resulting in medical malpractice. *See, e.g., Wilson,* 828 S.W.2d at 232; *Salas,* 760 S.W.2d at 840; *Johnston v. Sibley,* 558 S.W.2d at 137; *cf. Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 n. 1 (Tex.1991) (noting that "some contracts involve special relationships that may give rise to duties enforceable as torts, such as professional malpractice"); *Lopez,* 852 S.W.2d at 305 (holding that the Medical Liability and Insurance Improvement Act, TEX. REV.CIV.STAT.ANN. art. 4590i, § 1.03(a)(4) (Vernon Supp.1995), implicitly recognizes that a physician-patient relationship must exist before a health care liability claim may be asserted).

■ The court in *Salas* reasoned that, because a physician has the right to reject employment, the reason a physician declines to treat a patient is immaterial to the issue of medical malpractice. 760 S.W.2d at 841. We agree, and conclude that a physician may decline treatment and thereby decline to create a physician-patient relationship, even on the basis of an erroneous conclusion that the patient's condition is beyond his or her ability to treat.

Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship.

Applying these principles to the present case, we hold the summary judgment proof conclusively established that St. John had no physician-patient relationship with Pope. At no time did St. John agree to examine or treat Pope. Although St. John listened to Suarez's description of Pope's symptoms, and came to a conclusion about the basis of Pope's condition, he did so for the purpose of evaluating whether he should take the case, not as a diagnosis for a course of treatment.

The court of appeals held that St. John's affidavit suggested that he had "an implied contract" and "that St. John would take the actions he believes he was *obliged* to take and did in fact take." 862 S.W.2d at 660. We disagree with the court of appeals' interpretation of St. John's affidavit. While St. John testified in his first affidavit that there was a standard of care for on-call physicians, the question of duty is a question of law which must be decided before the issue of standard of care arises. *See Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex.1994) (holding that the existence of duty of health professional is question of law); *accord Salas,* 760 S.W.2d at 840 (holding that before reaching question of standard of care, court must decide the question of law, whether the defendant owes a duty).

We do not dispute that a physician may agree in advance to the creation of a physician-patient relationship. For example, a physician's agreement with a hospital may leave the physician no discretion to decline treatment of the hospital's clients. *Compare Hand v. Tavera,* 864 S.W.2d 678, 680 (Tex. App.—San Antonio 1993, no writ) (holding that hospital's contract with a health care plan and a physician's contract with the hospital created a physician-patient relationship), *with Fought,* 821 S.W.2d at 220 (holding that a physician who had no contractual duty to be "on call" owed no duty to examine or treat a motorcycle accident victim). The mere fact that a doctor is "on call" does not in itself impose any duty. *Wheeler,* 866 S.W.2d at 38; *Fought,* 821 S.W.2d at 220. St. John's affidavit testimony that he never agreed to treat Pope is clear, positive, direct, and easily controvertible. If any agreement existed which divested St. John of the discretion to choose whether to treat a patient, it was incumbent on Pope to present it in order to preclude summary judgment for the doctor.

We conclude that St. John established as a matter of law the lack of a physician-patient relationship. Absent such a relationship, he owed no duty to Pope. The trial court's summary judgment was proper, and the court of appeals erred in setting it aside. Accordingly, we reverse the judgment of the court of appeals, and render judgment that Pope take nothing from St. John.